UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DAWN MARIE KORTER et al, | CASE NO. 3:22-cv-05647-DGE |
| Plaintiffs, | ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 36) |
| v. | |
| CITY OF LAKEWOOD et al., | |
| Defendants. | |

## I.     INTRODUCTION

This matter comes before the Court on Defendants' motion for summary judgment.  (Dkt. No. 36.)  For the reasons identified herein, the Court GRANTS in part and DENIES in part the motion.

## II.     BACKGROUND

### A.  May 1, 2020 Incident

The following facts are undisputed.  On May 1, 2020, Lakewood Police Department officers Michael Wiley and Zachary Schueller stopped Mr. Said Joquin when he failed to stop at

a stop sign. (Dkt. No. 37 at 25–26.) Wiley had neither an audio recorder nor a dashboard

camera ("dashcam") in his vehicle. (*Id*. at 20–22.) Schueller, who arrived in a separate car, had

an audio recorder and a dashcam, but the view of the dashcam was significantly obstructed. (*Id*.

at 22; Dkt. No. 45-5.) Wiley approached the driver's side of Joquin's car and Schueller

approached the passenger side. (Dkt. No. 37 at 29–30.) Wiley asked Joquin for the standard

vehicle paperwork. (*Id*. at 30.) Wiley saw a pistol grip, which he recognized as part of a

handgun, located under the driver's seat. (*Id*. at 32–33.) Wiley told Joquin he saw a handgun in

the car, which Joquin readily confirmed. (*Id*. at 35.) Wiley informed Schueller there was a

handgun in car and both officers drew their own guns in the Sul position, wherein the muzzle of

firearm is pointed straight toward the ground. (*Id*.) Wiley told Joquin he should not reach for

the gun, and that he should keep his hands on his head. (*Id*.) When asked, Joquin said the gun

was not his and that he found it in Tacoma a few weeks prior. (*Id*. at 37.) When Joquin

anxiously lowered his hands to his face, Wiley warned Joquin to keep his hands on his head,

stating, "I'm going to shoot you, dude." (*Id*. at 42.) Wiley, Schueller, Joquin, and a passenger in

the front seat waited a few minutes for law enforcement backup to arrive. (Dkt. No. 46-1 at 7.)

Joquin kept his hands on his head during this time.

What happened next is disputed. Shortly before the backup officers arrived, Schueller

told Wiley he could not see where the handgun was and asked where it was. (Dkt. No. 45-5.)

Wiley states he did not hear this, but the question is audible in Schueller's dashcam audio

recording. (Dkt. No. 37 at 46; Dkt. No. 45-5.) Also audible on the dashcam audio recording is

Joquin answering, "Oh it's right here." (Dkt. No. 45-5.) Wiley contends he shot Joquin

"because he lunged for the handgun" located "at his feet . . . [o]n the floorboard." (Dkt. No. 46-1

1    at 3, 6.)  He fired four rounds at Joquin.  (Dkt. No. 46-1 at 6.)  Joquin died as a result of the

2    shooting.

3          Having reviewed the autopsy and ballistics reports, Plaintiffs' expert opined Wiley's

4    description of Joquin lunging for the gun was "inconsistent" with the physical evidence, i.e. "the

5    injuries, the bullet path trajectories, the body positioning [and] audio recording[.]"  (Dkt. No. 47

6    at 5.)  Put another way, "had [Joquin] lunged as described by Officer Wiley, [Joquin] would have

7    had a significantly different pattern of injuries."  (*Id.*)  Plaintiffs' expert further opined that

8    "Joquin was physically starting to gesture towards the gun in response to Officer Schueller's

9    question, not reaching or 'lunging' for it.  And this would have been obvious to a reasonable

10    person."  (*Id.*)

11    **B.  Wiley's Prior Force Incidents**

12          Wiley joined the Lakewood Police Department in 2004.  (Dkt. No. 37 at 6.)  Prior to this,

13    he served in the military for seven years.  (*Id.* at 7.)  He served as a firearms instructor and

14    former SWAT team leader with the Lakewood Police Department.  (*Id.* at 20.)

15          In 2013, Wiley was involved in the use of excessive force that resulted in the death of

16    another individual by a police sniper.  (Dkt. No. 45-7.)  A jury found Wiley, Defendant Michael

17    Zaro (who at the time was the Assistant Chief of Police), and the City of Lakewood liable under

18    the Fourth and Fourteenth Amendments for the 2013 incident.  (*Id.*)

19          In addition to the 2013 use of excessive force, Wiley has a documented history of using

20    force against persons he has assisted in detaining.  (*See* Dkt. Nos. 45-2, 45-12, 45-13, 45-14, 45-

21    15, 45-16, 45-17, 45-18.)  While each use of force may or may not have been appropriate under

22    the circumstances, at least two incidents raise questions.

23

24

1    On March 14, 2019, Wiley assisted a co-officer in arresting a female at a stairwell by

2    grabbing her hair and pulling her towards him.  (Dkt. No. 45-17 at 3–4.)  She "bumped her

3    head/face on the railing as she was taken to the ground (top landing)."  (*Id*. at 4.)  The woman

4    had obvious injuries above her eye requiring stitches and she complained by asserting "she had

5    been thrown around by the officers and that she did not deserve what happened."  (*Id*. at 5.)

6    Wiley and his co-officer were counseled on ensuring "they have reasonable suspicion for a

7    specific crime before detaining someone."  (Dkt. No. 45-17 at 6.)

8    On March 16, 2019, Wiley punched a teenage girl whom he and another officer had

9    "pinned down" after responding to a domestic violence incident.  (Dkt. No. 45-2 at 2.)  Both

10   officers were on top of her, subduing her.  (*Id*.)  His co-officer wrote an incident report

11   expressing concerns about Wiley's behavior, indicating the girl was not resisting in any

12   assaultive manner.  (*Id*. at 2–3.)  Wiley wrote in a separate report that he punched the girl

13   because she was trying to grab at his face, contradicting his co-officer's report.  (*Id*. at 7.)

14   Wiley's co-officer questioned Wiley's explanation.  (*Id*. at 2) ("I later learned from Officer

15   Wiley that he punched her because she grabbed his face.  I am not too sure about this claim.").

16   Wiley's co-officer reported Wiley to the Professional Standard board as he believed Wiley's use

17   of force was excessive.  (*Id*. at 3.)

18   In total, Wiley had at least 23 reported uses of force during his employment with the City

19   of Lakewood, none of which were deemed excessive.  (Dkt. No. 56 at 2.)  Wiley has "been

20   subject to three internal investigations related to use of force complaints, none of which were

21   sustained."  (*Id*. at 3.)

22

23

24

1    **C.  Wiley's Placement on Administrative Leave**

2          Zaro placed Wiley on administrative leave on July 24, 2019 after learning Wiley was

3    experiencing mental health issues.  (Dkt. No. 50 at 45; 45-19 at 7.)  On July 31, 2019, Wiley was

4    placed on modified duty assignment, which allowed him to be armed while on modified duty,

5    but did not allow him to operate a vehicle, take any enforcement action, or make any suspect

6    contacts.  (Dkt. No. 50 at 45.)  On August 5, 2019, Zaro released Wiley from modified duty and

7    allowed him to return to regular duty on August 10, 2019.  (*Id*. at 46.)

8          Of his own accord, Wiley began seeing therapist Phoebe Mulligan in July 2019.  (Dkt.

9    No. 50 at 48–61.)  He was diagnosed with PTSD in July 2019.[1]  (Dkt. No. 50 at 50.)  Despite his

10   return to full active duty, the record lacks any indication that Phoebe Mulligan formally opined

11   Wiley should be allowed back on full active duty as of August 10, 2019.

12         Following the shooting of Joquin, Zaro placed Wiley on administrative leave and Wiley

13   was referred to mental health provider Dr. Edwin Hill for a return-to-work evaluation.  (Dkt. No.

14   50 at 63, 66.)  Dr. Hill met with Wiley three times between June and December 2020; he

15   reported his findings directly to Zaro.  (Dkt. No. 50 at 68–70.)  In each of the three letters to

16   Zaro, Dr. Hill noted Wiley indicated that stress-related issues were interfering with his ability to

17   perform in an effective and safe manner.  (*Id.*)  Dr. Hill recommended in each of the reports that

18   Zaro reach out to Phoebe Mulligan for clarification about Wiley's ability to return to work full

19   time.  (*Id*.)  There is no indication Phoebe Mulligan confirmed Wiley's fitness for duty in the

20   aftermath of Joquin's death.

21

22

23   _____

[1] Wiley asserted he never received a Post-Traumatic Stress Disorder diagnosis.  (Dkt. No. 37 at
24   12.)

1    On March 12, 2021, the City of Lakewood's Shooting Review Board recommended that

2    Wiley's actions on May 1, 2020 be ruled "Within Policy."  (Dkt. No. 45-22.)  Following this

3    recommendation, Zaro returned Wiley to full duty effective March 20, 2021.  (Dkt. No. 45-23 at

4    2.)

5                                       **III.    DISCUSSION**

6        **A.  Legal Standard**

7              1.   Summary Judgment

8        Summary judgment is proper only if the pleadings, the discovery and disclosure materials

9    on file, and any affidavits show that there is no genuine issue as to any material fact and that the

10   movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (a).  The moving party is

11   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

12   showing on an essential element of a claim in the case on which the nonmoving party has the

13   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

14   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

15   for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

16   (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

17   metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if there is

18   sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

19   the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986);

20   *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir.

21   1987).

22        The determination of the existence of a material fact is often a close question.  The court

23   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

24

1   e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elect.*

2   *Service Inc*., 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

3   of the nonmoving party only when the facts specifically attested by that party contradict facts

4   specifically attested by the moving party. The nonmoving party may not merely state that it will

5   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

6   to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson*, supra).

7   Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not

8   be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–889 (1990).

9               2.   Qualified Immunity

10          "The doctrine of qualified immunity protects government officials 'from liability for civil

11  damages insofar as their conduct does not violate clearly established statutory or constitutional

12  rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223,

13  (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts employ a two-step test

14  to determine whether a police officer is entitled to qualified immunity. *Mattos v. Agarano*, 661

15  F.3d 433, 440 (9th Cir. 2011). First, the court decides whether the officer "violated a plaintiff's

16  constitutional right." *Id*. Second, the court determines whether the constitutional right was

17  "clearly established in light of the specific context of the case" at the time of the incident in

18  question. *Id*. (citing *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009). Courts may use their

19  discretion "in deciding which of the two prongs of qualified immunity analysis should be

20  addressed first." *Pearson*, 555 U.S. at 236.

21          The second step of the qualified immunity analysis—whether the constitutional right was

22  clearly established at the time of the conduct—requires courts to find the right was "sufficiently

23  clear that every reasonable official would have understood that what is he doing violates that

24

1    right." *Mattos*, 661 F.3d at 442.  Officials are still on notice "their conduct violates established

2    law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

3    **B.  Fourth Amendment**

4           1.  <u>Defendant Wiley</u>

5           Whether an officer violated the Fourth Amendment by using excessive force "requires a

6    careful balancing of the nature and quality of the intrusion on the individual's Fourth

7    Amendment interests against the countervailing governmental interests at stake." *Graham v.*

8    *Connor*, 490 U.S. 386, 396 (1989).  Because excessive force claims are highly fact specific, "all

9    that matters is whether the defendant's actions were reasonable." *Scott v. Harris*, 550 U.S. 372,

10   383 (2007) (cleaned up).  Courts consider the governmental interests at stake by looking at "(1)

11   how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety

12   of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to

13   evade arrest by flight." *Mattos*, 661 F.3d at 441.  The "most important" of these factors is

14   whether the suspect posed an immediate threat to the officer or others.  *Smith v. City of Hemet*,

15   394 F.3d 689, 702 (9th Cir. 2005).  When courts consider whether there was an immediate threat,

16   a "simple statement by an officer that he fears for his safety or the safety of others is not enough;

17   there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272,

18   1281 (9th Cir. 2001).

19          "[W]hether [a suspect] posed an immediate threat to officer safety . . . [is a] triable

20   question[] for a jury to decide." *Lopez v. City of Riverside*, 2023 WL 8433959 (9th Cir. 2023)

21   (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  An officer may not use deadly force when a

22   suspect does not pose an immediate threat even if armed with a weapon in hand.  *Hayes v. Cnty.*

23   *of San Diego*, 736 F.3d 1223, 1233–1234 (9th Cir. 2013) (the decedent's "unexpected possession

24

1   of [a] knife alone—particularly when he had committed no crime and was confronted inside his

2   own home—was not sufficient reason for the officers to employ deadly force."). "If the person

3   is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or

4   serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838

5   (9th Cir. 2013). "Law enforcement officials may not kill suspects who do not pose an immediate

6   threat to their safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d

7   1189, 1204 (9th Cir. 1997).

8          A court "must carefully examine all the evidence in the record, such as medical
           reports, contemporaneous statements by the officer and the available physical
9          evidence, as well as any expert testimony proffered by the plaintiff, to determine
           whether the officer's story is internally consistent and consistent with the known
10         facts. In other words, the court may not simply accept what may be a self-serving
           account by the police officer. It must also look at the circumstantial evidence that,
11         if believed, would tend to discredit the police officer's story, and consider whether
           this evidence could convince a rational factfinder that the officer acted
12         unreasonably.

13  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

14         Viewing the facts in the light most favorable to Plaintiffs, the trier of fact could find

15  Joquin did not engage in any furtive or threatening manner during the encounter. Joquin

16  appeared to be cooperative by complying with Wiley's instructions to keep his hands on top of

17  his head for several minutes while Wiley and Schueller were waiting for additional law

18  enforcement to arrive. The audio recording indicates there were no disagreements between

19  Wiley and Joquin for the first few minutes of the law enforcement encounter. There is also no

20  indication Schueller ever felt threatened by Joquin's conduct as Schueller never discharged his

21  weapon or yelled at Joquin. Plaintiffs' expert also opines that the bullet trajectories and the

22  locations of Joquin's injuries are inconsistent with Wiley's description of Joquin allegedly

23  lunging for a firearm. Furthermore, Schueller is heard on the audio recording asking where the

24

firearm was located and Joquin appears to have been attempting to answer Schueller's question immediately before being shot.  Taken together, a reasonable jury could find Wiley's description not credible and further find Joquin was not lunging for a firearm or that the firearm was not readily accessible to Joquin when Wiley discharged his firearm and killed Joquin.  Thus, a jury could find Wiley's use of deadly force was unjustified.

Using deadly force against a non-threatening person, even if armed, is a violation of a clearly established right.  *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1078–1079 (9th Cir. 2014) ("if the suspect *doesn't* reach for his waistband or make a similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door"); *George*, 736 F.3d at 839 ("If the deputies indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment."); *Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("the police officers could not reasonably have believed the use of deadly force was lawful because [the decedent] did not point the gun at the officers and apparently was not facing them when they shot him the first time").

Viewed in the light most favorable to Plaintiffs, a reasonable jury could find Wiley's use of deadly force was not justified.  If such a finding is made, Wiley violated a clearly established right.  Therefore, Wiley's motion for summary judgment as to the Fourth Amendment claim is DENIED.

### 2.  Defendant Zaro

"Vicarious liability may not be imposed on a supervisor for the acts of lower officials in a § 1983 action."  *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir.

1    2013).  But a "supervisor may be held liable under § 1983 'if he or she was personally involved

2    in the constitutional deprivation or a sufficient causal connection exists between the supervisor's

3    unlawful conduct and the constitutional violation.'"  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418

4    (9th Cir. 2003) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001)).  This

5    causal connection can stem from: "1) [the supervisors'] own culpable action or inaction in the

6    training, supervision, or control of subordinates; 2) their acquiescence in the constitutional

7    deprivation of which a complaint is made; or 3) [their] conduct that showed a reckless or callous

8    indifference to the rights of others."  *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000);

9    *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).[2]  The question here is whether

10   sufficient causal connection exists between Zaro's conduct in supervising Wiley and Wiley's

11   alleged excessive force.

12          Defendants argue the causal connection does not exist because "Plaintiff cannot point to

13   any trainings that were *required*, but not provided [to] Lakewood Police Officers or that industry

14   standards in supervision and control officers were not followed by Zaro."  (Dkt. No. 36 at 24.)

15   However, viewed in the light most favorable to Plaintiffs, the record shows Zaro was on notice

16   of Wiley's involvement in the 2013 death of another individual wherein Wiley (and Zaro) was

17   found to have used excessive force.  Zaro also should have been aware that a co-officer reported

18   Wiley to the Standard Review board for the alleged use of excessive force on March 16, 2019.

19

20   _____

21   [2] In general, "the factors that a plaintiff must prove in order to establish a claim for supervisory
     liability depend on the alleged underlying the constitutional deprivation."  9th Cir. Model Civ.
     Jury Instr. 9.4, comments (2023) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675–677 (2009); *Starr*

22   *v. Baca*, 652 F.3d 1202, 1206–1207 (9th Cir. 2011)).  *Iqbal* does not appear to have modified the
     standard for applying supervisory liability for § 1983 claims based on Fourth Amendment

23   claims.  *See generally Hyde v. City of Wilcox*, 23 F.4th 863, 874 (9th Cir. 2022) (applying same
     supervisory liability standard to the plaintiff's excessive force, failure to train, and failure to

24   supervise claim).

1   Zaro should have been aware that Wiley was counseled for using force while detaining a female

2   suspect on March 14, 2019.  Zaro also should have been aware that Wiley had been involved in

3   at least 23 incidents of use of force as a City of Lakewood police officer.  Zaro also was aware

4   Wiley was suffering from mental health issues in 2019, for which Zaro placed Wiley on

5   administrative leave.  Zaro also was aware that Zaro returned Wiley to full duty despite the lack

6   of any formal release from his mental health counselor.  Plaintiffs' expert also opines that the

7   "appropriate action consistent with the standard of care" would have been to place Wiley on

8   administrative leave and order a full investigation based on Wiley's history of force and mental

9   illness, such that Wiley would not have been on active duty during the May 1, 2020 incident.

10  (Dkt. No. 49 at 2.)

11          Whether a causal connection exists between Zaro's actions or inactions and Wiley's

12  alleged constitutional violation of a clearly established right is a question of fact for the jury.

13  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994.)  Viewed in the light most favorable to

14  Plaintiffs, a jury could conclude Zaro engaged in culpable action or inaction in his supervision or

15  control of Wiley or that Zaro's inaction leading up to the May 1, 2020 shooting showed a

16  reckless or callous indifference to the rights of others.

17          Defendant's motion for summary judgment as to Plaintiffs' Fourth Amendment claim

18  against Zaro is DENIED.

19                          3.   Defendant City of Lakewood

20          A claim for municipal liability exists only where "execution of a government's policy or

21  custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

22  represent official policy, inflicts the injury that the government as an entity is responsible under

23  § 1983."  *Monel v. Department of Social Services*, 436 U.S. 658, 694 (1978).  *Monell*'s policy

24

1   requirement can be satisfied in one of three ways: (1) the municipality acted according to an

2   "expressly adopted official policy"; (2) the municipality maintained a longstanding practice or

3   custom; or (3) the municipality's official with final policy-making authority committed the

4   constitutional tort or ratified a subordinate's unconstitutional decision or action and the basis for

5   it. *Gordon v. Cnty. of Orange,* 6 F.4th 961, 973–974 (9th Cir. 2021).

6                           i.    *Monell* claim based on failure to act

7          Plaintiffs argue the City of Lakewood had a policy of inaction despite knowledge of

8   Wiley's prior history of use of excessive force and Wiley's mental health issues.  (Dkt. No. 44 at

9   24.)

10         To prove a *Monell* claim based on failure to act, a plaintiff must show they (1) were

11  deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounts to

12  deliberate indifference to the plaintiff's constitutional rights; and (4) the policy was the moving

13  force behind the constitutional violation.  *Oviatt By and Through Waugh v. Pearce*, 954 F.2d

14  1470, 1474 (9th Cir. 1992).

15         "A public entity may be held liable for a longstanding practice or custom . . . when for

16  instance, the public entity fails to implement procedural safeguards to prevent constitutional

17  violations or, sometimes, when it fails to train its employees adequately."  *Gordon*, 6 F.4th at

18  973 (cleaned up).  "The custom must be so 'persistent and widespread' that it constitutes a

19  'permanent and well settled city policy.'"  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)

20  (quoting *Monell*. 436 U.S. at 691).  "Liability for improper custom may not be predicated on

21  isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency

22  and consistency that the conduct has become a traditional method of carrying out policy."  *Id.*

23

24

1    A policy amounts to deliberate indifference "when the need for more or different action is

2    so obvious, and the inadequacy of the current procedure so likely to result in the violation of

3    constitutional rights, that the policymakers can reasonably be said to have been deliberately

4    indifferent to the need." *Oviatt*, 954 F.2d at 1477–1478 (cleaned up).  This is generally a

5    question for the jury.  *Id*. at 1478.

6        Viewing the evidence in the light most favorable to Plaintiffs, a jury could find the City

7    of Lakewood had a longstanding practice or custom of inaction when it came to investigating

8    and disciplining use of force incidents as evidenced by how the City of Lakewood treated Wiley

9    since 2013.  Wiley was found to have engaged in use of excessive force in 2013 after a jury trial.

10   Wiley had been involved in at least 23 incidents of force while working with the City of

11   Lakewood.  A co-officer reported Wiley to the Standard Review board for the alleged use of

12   excessive force on March 16, 2019.  Wiley was counseled after using force while detaining a

13   female suspect on March 14, 2019.  Wiley has never been determined by the City of Lakewood

14   to have inappropriately used force in any incident where force was used.  Wiley also was

15   suffering from mental health issues in 2019 and was placed on administrative leave.  Wiley was

16   returned to full duty despite the lack of any formal release from his mental health counselor (and

17   after the May 1, 2020 shooting, Wiley again was returned to full duty despite the lack of any

18   formal release from his mental health counselor).  Taken together, a reasonable jury could find

19   the existence of a policy of inaction predicated on the failure to properly investigate or discipline

20   use of force incidents involving Wiley.

21       This case is similar to *Jenkins v. City of New York*, 388 F. Supp. 3d 179 (E.D. New York

22   2019).  *Jenkins* involved a *Monell* claim based on a single officer's long history of use of force

23   and the police department's failure to take action by not properly investigating or disciplining the

24

1   officer.  Considering the municipality's inaction, a "reasonable jury could find that a monitoring

2   and disciplinary system that disregards any complaint or series of similar complaints because

3   they are unsubstantiated does not demonstrate a 'meaningful attempt on the part of [the City]

4   to . . . forestall further incidents,' and it may be reasonably inferred that such a system

5   encourages similar excesses." *Id*. at 192.

6       Accordingly, a reasonable jury could find that the City of Lakewood had a policy of

7   inaction predicated on the failure to investigate or discipline Wiley over the years, amounting to

8   deliberate indifference to Joquin's constitutional rights and that such policy was the moving

9   force behind the constitutional violation.

10          ii.   *Monell* based on failure to train and supervise

11      Plaintiffs also assert the City of Lakewood failed to train or supervise Wiley after Wiley

12   was found by a jury to have used excessive force and after Wiley was involved in use of force

13   incidents before May 1, 2020.  (*Id*. at 29.)

14      The criteria for establishing *Monell* liability for failure to act are the same criteria used

15   for establishing *Monell* liability for failure to train or supervise.  *Blankenhorn v. City of Orange*,

16   485 F.3d 463, 484 (9th Cir. 2007); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir.

17   1989) ("We see no principled reason to apply a different standard to inadequate supervision" as

18   compared to inadequate training.).

19      "However, evidence of the failure to train [or supervise] a single officer is insufficient to

20   establish a municipality's deliberate policy." *Blankenhorn*, 485 F.3d at 484.  "[A]bsent evidence

21   of a 'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only

22   be classified as negligence on the part of the municipal defendant—a much lower standard of

23

24

fault than deliberate indifference.'" *Id*. at 484–485 (quoting *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)).

Here, Plaintiff's allegations of failure to train and failure to supervise involve one single officer.  There are no allegations the City of Lakewood had a program-wide inadequacy in training or a program-wide inadequacy in supervising officers.  Unlike a failure to act involving an officer with a history of use of force and mental health issues that evidence the City of Lakewood's deficiencies in investigating and disciplining officers, any shortfalls in training Wiley or supervising Wiley can only be classified as negligence as to one officer.  Such negligence does not evidence a program-wide policy that can meet a deliberate indifference standard of fault based on failure to train or supervise.

iii.    *Monell* claim based on ratification

As to Plaintiff's *Monell* theory of liability based on ratification, a "plaintiff must show that 'an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate.'"  *Segura*, 647 F. Supp. 3d at 939 (quoting *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008)).  A plaintiff must put forth evidence "about actions that policymakers took in connection with their 'approval' of the misconduct that would support an inference that they actually ratified the police officer's alleged misconduct."  *Nguyen v. Cnty. of Orange*, 2023 WL 4682301, at *3 (C.D. Cal. June 8, 2023) (quoting *Mitchell v. County of Contra Costa*, 600 F.Supp.3d 1018, 1033 (N.D. Cal. 2022)).  "Ratification . . . generally requires more than acquiescence."  *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014).  "Policymakers must make 'a deliberate choice to endorse the officers' actions.'"  *Segura*, 647 F. Supp. 3d at 939 (quoting *Sheehan*, 743 F.3d at 1231).  "A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim."  *Mitchell*, 600 F. Supp. 3d at

1    1033 (quoting *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004)).  "Ordinarily, ratification is a

2    question for the jury."  *Christie v. Iopa*, 176 F.3d 1231, 1238–1239 (9th Cir. 1999).

3            At issue is whether Zaro's handling of Wiley after the May 1, 2020 shooting amounted to

4    ratification of Wiley's actions.  On March 12, 2021, the City of Lakewood's Shooting Review

5    Board recommended Wiley's conduct on May 1, 2020 be deemed to have been "Within Policy."

6    (Dkt. No. 45-22.)  Following this recommendation, Zaro in his capacity as Chief of Police

7    returned Wiley to full duty effective March 20, 2021.  (Dkt. No. 45-23 at 2.)  This decision was

8    made despite Zaro having previously placed Wiley on administrative leave in 2019 for mental

9    health issues and despite Zaro not receiving a formal mental health clearance after the May 1,

10   2020 shooting.  The psychologist hired by the City of Lakewood to evaluate Wiley

11   recommended Zaro contact Wiley's mental health counselor "for further clarification about

12   Office[r] Wiley's readiness to return to work on full duty."  (Dkt. No. 50 at 70.)  Yet, there is no

13   evidence Wiley's mental health counselor, or the psychologist assigned to conduct the

14   evaluation, communicated to Zaro Wiley's readiness to return to full duty work.

15           The Court concludes there is a question of fact as to whether Zaro ratified Wiley's

16   conduct because Zaro accepted the Shooting Review Board's recommendation without question

17   despite his knowledge of Wiley's pre and post shooting mental health issues.  The circumstances

18   presented are sufficient to allow a jury to determine whether the City of Lakewood, through its

19   policymaker Zaro, ratified Wiley's May 1, 2020 conduct.

20           Accordingly, summary judgment as to Plaintiff's *Monell* claim is DENIED.  The claim

21   may proceed on a theory of failure to act and ratification.

22

23

24

C.  **Fourteenth Amendment**

Plaintiffs claim Defendants violated Joquin's family's Fourteenth Amendment rights by depriving them of a familial relationship without due process.  To find a Fourteenth Amendment violation for deprivation of a familial relationship, an official's conduct must "shock the conscience." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014).  "Conscience-shocking actions are those taken with (1) 'deliberate indifference' or (2) a 'purpose to harm . . . unrelated to legitimate law enforcement objectives.'" *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).  "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*

1.  Defendant Wiley

Plaintiffs assert Wiley's conduct on May 1, 2020 shocked the conscience but do not identify whether the Court should apply the deliberate indifference standard or the purpose to harm standard.  (*See* Dkt. No. 44 at 40–41.)  Notwithstanding, under either standard the Court finds a question of fact exists as to whether Wiley acted with deliberate indifference or with a purpose to harm.  As already identified, when viewed in the light most favorable to Plaintiffs, the facts indicate Joquin had been cooperative for several minutes up to the point he was shot, that Joquin was responding to Schueller's question about the location of the firearm when he was shot, and that Joquin had not engaged in any furtive movement that would have made a reasonable officer fear for their life based on the physical evidence as explained by Plaintiffs'

1    expert.  Based on these facts, a jury could find Wiley acted with deliberate indifference and/or

2    with a purpose to harm unrelated to a legitimate law enforcement objective when he shot Joquin

3    several times on May 1, 2020.

4          Notwithstanding, Defendants argue Wiley still is entitled to qualified immunity because

5    there is no "clearly established law putting an officer on notice that using deadly force in the

6    situation facing Officer Wiley would violate the Fourteenth Amendment familial relations

7    rights[.]"  (Dkt. No. 36 at 23.)  But as of at least "March 23, 2006, it was clearly established law

8    that a state official, who acts with a purpose to harm unrelated to a legitimate law enforcement

9    objective, violates the Fourteenth Amendment due process clause." *A.D.*, 712 F.3d at 454.

10   Similarly, it is clearly established law that a law enforcement officer violates the Fourteenth

11   Amendment due process clause when the officer, faced with actual deliberation, acts with

12   deliberate indifference to a plaintiff's constitutional due process rights.  *See Wilkinson*, 610 F.3d

13   at 554.

14         Defendant's motion to dismiss Plaintiffs' Fourteenth Amendment claim against Wiley is

15   DENIED.

16               2.   Defendant Zaro

17         Applying the same supervisory liability standard discussed in Section III.B.2, *supra*, to

18   Plaintiffs' § 1983 claim based on the Fourteenth Amendment against Zaro, and for the same

19   reasons stated in Section III.B.2, the Court finds there are questions of fact whether Zaro

20   engaged in culpable action or inaction in his supervision or control of Wiley or whether Zaro's

21   inaction leading up to the May 1, 2020 shooting showed a reckless or callous indifference to the

22   rights of others.

23

24

1    Viewed in the light most favorable to Plaintiffs, a jury could find that a causal connection

2  exists between Zaro's actions or inaction and Wiley's alleged constitutional violation of a clearly

3  established right (i.e., the deprivation of familial relationship without due process).

4    Accordingly, Defendants' motion for summary judgment as to the Fourteenth

5  Amendment claim against Zaro is DENIED.

6            3.  Defendant City of Lakewood

7    Plaintiffs' Fourteenth Amendment *Monell* claim may proceed against the City of

8  Lakewood for the same reasons Plaintiffs' Fourth Amendment *Monell* claim may proceed as

9  discussed in Section III.B.3, *supra*.  *See also Shelley v. County of San Joaquin*, 996 F. Supp. 2d

10  921 (E.D. Cal. 2014) (allowing *Monell* claim to proceed for violation of Fourteenth Amendment

11  due process guarantees).

12    Accordingly, Defendants' motion for summary judgment as the Fourteenth Amendment

13  claim against the City of Lakewood is DENIED.

14  **D.  Assault and Battery**

15    Plaintiffs respond in their opposition they do not bring their clams for assault and battery

16  against Zaro. (Dkt. No. 44 at 43.)  Accordingly, the Court GRANTS the motion as to the assault

17  and battery claims against Zaro.

18

19

20

21

22

23

24

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 36) - 20

## IV.    CONCLUSION

Having reviewed the motion, the opposition, the reply, and the remainder of the record, the Court DENIES in part and GRANTS in part Defendant's motion for partial summary judgment (Dkt. No. 36) as follows:

1.  Plaintiffs' claims for assault and battery against Defendant Michael Zaro are DISMISSED with prejudice.

2.  All other requests for relief are DENIED as explained herein.

Dated this 6th day of August 2024.

David G. Estudillo
United States District Judge

ORDER ON MOTION FOR SUMMARY JUDGMENT (DKT. NO. 36) - 21