

EXHIBIT 1

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF WASHINGTON
                         AT TACOMA
_____

DAWN MARIE KORTER, as an             )
individual, and as Personal          )
Representative for the ESTATE OF     )
SAID JOQUIN,                         )
                                     )
              Plaintiffs,            )
                                     )
      vs.                            ) No. 3:22-cv-05647-DGE
                                     )
CITY OF LAKEWOOD, a political        )
subdivision of the State of          )
Washington d/b/a Lakewood Police     )
Department, and MICHAEL WILEY, an    )
individual,                          )
                                     )
              Defendants.            )
                                     )
_____

              Deposition Upon Oral Examination

                            of

                      MATTHEW NOEDEL
_____

                      Taken via Zoom




DATE:  April 17, 2024

REPORTED BY: Victoria E. Leckie
             CCR No.:  2779
```

Page 14

1  of the reconstructive elements of this event.
2       We know that he was seated or we believe based on
3  the data provided that he was seated in the driver's seat
4  when the shots occurred.
5       So that's what these two images are.  These are
6  still screen captures from the three-dimensional program
7  called Poser to track -- to demonstrate the wound tracks
8  that Mr. Joquin sustained.
9    Q.  Okay.  And I want to start with what -- you know,
10 based on your answers to some of my previous questions,
11 about what bullet track trajectory analysis can and then
12 cannot tell you, you know, what is for sure -- you know,
13 what is known, you know, based on your analysis.
14      So I'm going to kind of walk through the image on
15 the right as it's probably a more accurate depiction of the
16 -- you know, the shooting itself, right, as opposed to him
17 laid out with his arms like this.
18      We know his arms weren't like this based on the
19 information, correct?
20   A.  Correct.
21      That profile is anatomical.  That's how the
22 pathologist measured him.  So yes, the image on the right is
23 more reflective of how he was actually positioned in the
24 vehicle.
25   Q.  Right.  Okay.

Page 15

1       And so I want to start with -- really I want to
2  start with his right arm, I think.
3    A.  Okay.
4    Q.  So you have his right arm in this image placed,
5  you know, on the right of his abdomen, sort of reaching
6  down.
7       Do we know where his right arm was based --
8    A.  No.
9    Q.  -- on physical evidence?
10   A.  No.  There is no physical evidence to identify the
11 position of his right arm.
12   Q.  So his right arm could have been positioned like
13 it is in this 3-D model, or it could have been in his pocket
14 or above his head or somewhere completely different.  We
15 just don't know.
16      Is that fair?
17   A.  That's correct.
18      Any reasonable range of motion that Mr. Joquin
19 could have -- so I'll use an example of he could be touching
20 the ceiling of his vehicle with this right arm, or it could
21 be all the way down by his ankle.  Any -- any anatomically
22 possible position for Mr. Joquin is obtainable by that right
23 arm.
24   Q.  Okay.  Well -- okay.  And I -- I -- I'll follow-up
25 on that in a second.

Page 16

1       But let's go to the left arm.
2    A.  Okay.
3    Q.  So this image here on the right side of my screen,
4  there's another one that you've done that's sort of right
5  here.  And so I've scrolled to page six of your report.
6       Do you see that?
7    A.  Yes.
8    Q.  And what is page six showing us?
9    A.  So page six is inserting this three-dimensional
10 model that I've made of Mr. Joquin -- I made him yellow --
11 with the cones.  I've made them blue in this particular
12 image.  And I've seated him in the three-dimensional model
13 of data that was provided to me of the actual vehicle he was
14 positioned in.
15      And so I wanted to put -- instead of having him,
16 as in the prior image on page three, sitting in open space,
17 I wanted to troubleshoot and see what that image looks like
18 when you put him in the actual confines of the vehicle that
19 he was stopped in.  And that's the purpose of -- of the
20 additional images on page six.
21   Q.  Okay.  Okay.  So page -- the images on page six
22 are just providing more environmental context for the image
23 on the right-hand side of the 3-D model that you've created
24 on page three; is that fair?
25   A.  That's correct.  The only difference being the

Page 17

1  color changes that -- that are allowed by importing it into
2  the three-dimensional program of the vehicle itself.
3    Q.  Okay.
4    A.  So -- but yes, it's the same -- the same diagram,
5  one with no context of the car and the later diagram with
6  the context of the car.
7    Q.  Okay.  So what can you tell me about where Said's
8  -- Said Joquin's left arm was located at the time of the
9  shooting?
10   A.  So based on the damage to his lower left arm near
11 his elbow, the appearance of the entry wounds into his
12 abdomen, it's clear that bullets went through his -- his
13 upper -- from his elbow to his upper left arm and continued
14 into his abdomen.
15      That's described in the autopsy as well as
16 depicted in the autopsy photographs that support the
17 irregular reentries into his left side.
18      So putting his elbow down in front of -- somewhere
19 in front of that -- those reentries into his abdomen is how
20 I organized this -- this image on page three and then
21 imported that into the vehicle on page six.
22      So the arm, because it has entry, exit and
23 reentry, is more diagnostic than the fourth shot that we're
24 aware of in this event.
25   Q.  Okay.  And are you able to say on a

Page 26

1  body mic.
2      Have you -- it sounds like -- I mean, based on
3  this, it would appear that you've listened to that audio?
4      A.  I have, yes.
5      Q.  Okay.  And in the audio -- do you recall what
6  Officer Wiley says when he learns of the gun?
7      A.  Not from a direct quote.  But I do recall him
8  identifying that he recognized a gun.  "Don't go for the
9  gun," language along those lines.
10     Q.  Do you recall him saying, "You said there's a gun
11 in the car"?
12         MR. JUSTICE:  Object to the form.
13         You can answer.
14     A.  I -- I don't recall verbatim what was recorded
15 verbally between the -- between the officer.
16     Q.  Okay.  Do you recall from Officer Schueller a
17 little bit later on a statement of, "Hey, Wiley, I can't see
18 the gun"?
19     A.  I do recall that, yes.
20     Q.  Okay.  And it's shortly after that that we hear
21 these shots, and this is the -- sort of the capture of the
22 image that's on page five of your report here?
23     A.  Correct.  Yeah.  My Figure 4 is the waveform
24 profile of the actual gunshots.  It's been cropped so it
25 doesn't include any of the other language that was used

Page 27

1  because that's -- that's not something that was -- was -- is
2  useful in reconstruction.
3         But yes.  I mean, there was certainly conversation
4  recorded.  And I do recall Officer Schueller saying he
5  didn't see the gun or where's -- "I don't see it from my
6  position" or something to that effect.  Then shots were very
7  soon after that.
8      Q.  Right.
9         You hear some words from a third party believed to
10 be Said Joquin afterwards?
11     A.  It could be.  I didn't analyze the audio -- the
12 verbal portion of the recording.
13     Q.  Okay.  There are, you know, alternate
14 explanations, obviously, as to why -- you know, I guess what
15 occurred in the moments just before the shooting and kind of
16 what caused the shooting.
17        And I want to ask you some questions about what
18 you will or will not testify to at trial in this case.
19     A.  Okay.
20     Q.  So will you testify on a more-probable-than-not
21 basis that Said Joquin was reaching or, as Officer Wiley
22 states, lunging for the gun?
23     A.  No.
24     Q.  Okay.  Your testimony will be limited to
25 discussing what the physical evidence shows in terms of the

Page 28

1  placement of the body parts that have been impacted really
2  by the shots; is that fair?
3      A.  Unless I'm called to rebut testimony that reveals
4  scientific principles that are not supported by the
5  evidence.
6         So I wouldn't say that I wouldn't reveal that kind
7  of information.  But on my -- I do not anticipate being able
8  to tell you what actions, if any, Joquin took in the moments
9  before Officer Wiley shot.
10     Q.  Right.
11        So I guess what I'm getting at is:  You can't say
12 on a more-probable-than-not basis whether Said Joquin was
13 saying "It's right here," pointing to the gun, or he was
14 reaching for the gun in an effort to get it and, you know,
15 shoot Officer Wiley?
16     A.  Correct.
17        In my opinion, no scientific assessment can
18 identify that.  So if somebody does say that, then I might
19 have to testify to reveal why that's not an appropriate
20 response to the forensic analysis of this event.
21     Q.  Okay.  Okay.  So -- that's fair.
22        I do want to ask you about your rebuttal report.
23        Oh, are you -- do you have any background in
24 toxicology?
25     A.  I do.

Page 29

1      Q.  Did you look at any toxicology issues in this
2  case?
3      A.  No.  I do not consider myself a current expert in
4  toxicology, although I started my career in forensic tox.
5  It's not a practice I've maintained, so I have no opinion
6  about interpretation of any toxicological data that might be
7  connected to this case.
8      Q.  Okay.  Can you say on a more-probable-than-not
9  basis whether or not any alleged intoxication had any causal
10 relationship with the shooting in this case?
11     A.  No.  I'm not able to opine on any of the -- any of
12 the toxicological findings beyond my area of expertise.
13     Q.  Okay.  Okay.  So I want to ask you about some of
14 the images in your rebuttal report and specifically rebuttal
15 Figure 3 on page three of your report.
16        Are you able to see what I'm showing?
17     A.  Yes, I see it.
18     Q.  Okay.  Can you describe for me what's being shown
19 in the images on my screen?
20     A.  Yes.  So these are -- these are a side view and a
21 top view with four color-coded bullet tracks that -- that I
22 approximated from the autopsy records and the medical
23 records -- or -- I'm sorry -- the autopsy and -- records and
24 photos.  And then these were placed into the -- a
25 three-dimensional documentation of the vehicle.